SULLIVAN COUNTY v. GRAFTON COUNTY.          { March 12, 1875.

By Gen. Stats., ch. 75, sec. 9, it is made an offence to bring a "poor and
indigent" person from a county in which such person has resided or
been supported, into another county, the person effecting such removal
knowing such person to be "poor and indigent." But the knowledge
spoken of in the statute implies a culpable intent, since, in a legal sense,
every violation of a known law is culpable.

PETITION for the removal of a pauper, alleging that Maria Phillips, a
poor and indigent person, having no visible means of support, and no
legal settlement in any town in this state, and no relation chargeable
with her support within the county of Sullivan, was, on the 3d day of
November, 1873, brought into and left in the town of Sunapee in the
county of Sullivan, from the town of Enfield in the county of Grafton,
where she had until then resided, and been supported by some person
or persons to the complainant unknown; that application had been
made to the selectmen and overseers of the poor of the town of Enfield
for her support as a pauper standing in need of relief, previous to her
removal from said county of Grafton; that she never was a resident
of said county of Sullivan, and had no relatives therein bound by law to
support her; that no application had ever been made to any of the
authorities of the county of Sullivan, or of any town in said county, pre-
vious to her removal as aforesaid, for her support as a pauper standing
in need of relief; and that the person or persons who brought her into
and left her in said county of Sullivan well knew her to be poor
and indigent, and wrongfully intended to cast the burden of her support
upon said county of Sullivan.

The petitioners pray for an order for the removal of the said Maria
Phillips into said county of Grafton, from which she was so brought.

A hearing was had before SMITH, J., when it appeared in evidence
that the said Maria Phillips was eighty years of age in June, 1874; that
she was born in Canaan, N. H., and was married in her seventeenth
year to Asa Kimball of said Canaan, with whom she lived about thirty
years, and by whom she had twelve children, six of whom are now liv-
ing; that while she lived with her said husband they resided in Canaan,
Grafton, and Lebanon in this state, with the exception of about one
year, when they lived in Northfield, Vt.; that for the last two years
they lived together they resided in said Canaan; that by reason of his
bad treatment of her she left him and went to Lebanon, N. H., and
resided there two years, and that he went to Vermont; that about two
years after their separation she obtained a divorce from him in Grafton
county; that for four or five months after she was divorced she resided
in Lebanon, and some two years after was married to one Dalton of
Lebanon; that she and Dalton resided after their marriage in Wil-
mot, Sutton, Bradford, and Canaan, till November, 1856, when they

removed to Stockbridge, Vt., where he died in March, 1857. After the death of Dalton she resided at Stockbridge about two years, when she married one Phillips of Stockbridge, and lived with him at S. till he went to the war, since which time she has never seen or heard from or of him. There was no evidence that she or either of her husbands ever had any legal settlement in any town in this state. After Phillips went into the army she resided with her son Franklin, in Stockbridge, about one year; then with her son Wyman P. Kimball about one month in Sutton in this state; then about one year in Claremont, N. H., with her daughter Mrs. Williams, who lived there; then in Bethel, Vt., with her son Franklin, but how long did not appear; then in Claremont with her son Daniel Harvey Kimball three months; then in Hanover with her daughter, wife of Hazen Hutchins, about two years, carrying with her a little bedding, all the property she had besides her clothes; then in Lawrence, Mass., with her son Franklin, who had moved there, about two years, taking with her her bedding and clothes; then she went back to Hanover, with bedding and clothes, and remained about eighteen months with Mr. and Mrs. Hutchins; then she returned to Lawrence, with bedding and clothes, to her son Franklin, where she remained till August or September, 1873. In August or September, 1873, she was brought by her son Franklin, with her assent, from Lawrence, to her son Wyman P. Kimball's in Sunapee, without any arrangement with or previous notice, where she thought that perhaps she might spend the winter at Wyman's, and then would go somewhere among her children. She left Lawrence because she had been at Franklin's a good while, and his health was poor, and he had no means except what he and his family earned by work in the mills, and she did not know where to go. They arrived at Wyman's Thursday night, and Franklin returned on the following Monday. When Franklin brought her to Wyman's he was informed by him that he could not keep her, as he had a son very sick and not expected to live but a short time, and requiring constant attention. This son had been sick nearly a year, and died some six weeks afterwards. Wyman asked Franklin to stop another day before returning home, and take his (Wyman's) horse and carry their mother to Hanover, to her daughter Mrs. Hutchins. But Franklin said he could not stop longer, and declined to do it. On the afternoon of the same day that Franklin returned to Lawrence, Wyman carried his mother to Mr. Horton's in Enfield, whose wife is a granddaughter of Mrs. Phillips, and made arrangements with Mrs. Horton to take her to Hanover after a short visit, provided she was willing to go. After a few days she was carried by Mrs. Horton to James T. Kimball's in Enfield, a grandson of Mrs. Phillips, upon invitation of Mrs. Kimball to come and make them a visit, where she remained seven or eight weeks. When she was carried to Horton's by Wyman he had no intention of her receiving aid as a poor person, and there was no understanding between him and Franklin that she should be a charge upon any town or county. After she had been at James Kimball's some three

weeks, Mrs. Horton wrote Wyman P. Kimball to come up and take care of his mother. Until he received this letter he supposed she had been carried to Hanover by Mrs. Horton. Wyman P. Kimball went to Enfield, and went to the house of Mr. How, one of the selectmen of Enfield, and, not finding him at home, left at his house a letter, of which the following is a copy:

Mr. A. How:—I Wyman P. Kimball of Sunapee, N. H., have bin to your house to see you and have you take care of my mother for she has no home and I cannot take care of heir.  yours with respect Wyman P. Kimball Sunapee N. H.

Wyman P. Kimball made this application immediately upon his arrival at James Kimball's, without consulting his mother, and before he had gone into the house to see her, and also against the remonstrance of Mr. and Mrs. James Kimball, who offered to keep her till after his son should recover, or die. Wyman Kimball returned home, leaving his mother at James Kimball's in Enfield.

When she had been there some seven or eight weeks, James Kimball went to Mr. How, one of the selectmen, and told him he must take her and take care of her, and informed him of her circumstances, and that he was not able to take care of her. How told him that he had nothing to do about it, and he must go to Charles Clark, overseer of the poor. He then went to Clark and applied for help for Mrs. Phillips. Clark informed him that he had already seen Mr. Lewis C. Pattee, one of the commissioners for Grafton county, in relation to her; that Pattee had told him that Sullivan county or Wyman Kimball was liable for her support, and had forbidden him from furnishing her any aid; and Clark declined to assist her.

James Kimball thereupon went to Mr. Pattee and told him her circumstances, and applied for assistance for her. Pattee informed him that a man had brought her out of Sullivan county, and he did not think he had any right to assist her. Pattee then negotiated with James Kimball to carry her back to Wyman Kimball's in Sunapee for the sum of ten dollars, which he afterwards paid him. At the time the agreement was entered into, James Kimball said to Pattee that if she was or had been a pauper he might make himself liable for carrying her back. Pattee replied "there was no such thing, but if there was he would see him harmless." She was carried back by James Kimball, on Sunday, November 2, and left at Wyman Kimball's house during the absence of Mr. and Mrs. Kimball,—James Kimball leaving for home without waiting for their return. Since that time she has been supported in Sunapee at the expense of the county of Sullivan. It was the proposal of Wyman Kimball, and not of his mother, that she was carried by him to Horton's in September. She said she hated to go, as she was not acquainted with them. On the way she cried, but made no objections to going. She has no relations and had not then, in the state of New Hampshire or elsewhere, of sufficient ability to support her. She was carried by Wyman Kimball to Horton's without any notice or previous intimation that she was coming, and was brought

back to Wyman Kimball's by James Kimball without any intimation or previous notice to him. While at Horton's, Mrs. H. wrote Mrs. Hutchins, of Hanover, to know whether she would receive her, and received a reply that she could not. When she was carried to Horton's, Wyman Kimball said, after his son should get better, or die, she might come back. At the time Pattee procured James Kimball to carry her back to Sunapee, he knew she was poor and in need of relief, and knew how long she had resided with James T. Kimball and Horton in Enfield, and that she had stopped at different times with Hutchins in Hanover; that James T. Kimball had applied to the overseer of the poor in Enfield for relief for her; that she had not resided a year in the county of Sullivan; and he did not understand that she had ever been relieved as a pauper.

The court ruled that the foregoing evidence supported the petition, and that the prayer thereof be granted.

The petitionees excepted that the evidence did not support the petition, and that the same should be dismissed.

Case transferred.

*Edes,* for the petitioners.

*Sargent & Chase,* and *Fling,* for the petitionees.

I. Mrs. Kimball went to her son Wyman's, expecting and intending to remain there through the winter; and this was only prevented by the sickness of his son. He carried her to Mr. Horton's, of Enfield, only for the time being, and he agreed with her that when his son should recover, or die, she might return to his house; and although it is said that she was carried back to his house without any intimation or previous notice to him, yet it was in accordance with the arrangement he himself had made, for his son had died in the meantime, and he had every reason to expect that she would return, as he had consented that she might do.

While at Horton's and James Kimball's her stay was only temporary, as she was intending and expecting to return to Wyman's as soon as the contingency should happen upon which her return depended. All the home she had in this state was thus at Wyman Kimball's. Her intention would have a controlling influence in fixing the place of her residence under those circumstances; and her intention is not only found by the court, but is apparent to every one. She went to Wyman's intending to spend the winter there; and when this is prevented by the sickness of the son, she goes away for a temporary absence, obtaining permission to return, and intending to return, as soon as that sickness terminated in recovery, or death; and the first opportunity that offered she did return to Wyman's. All the residence she could be said to have anywhere was at Wyman's. There is where she has been since, until recently, where she preferred to be, and where she from the first designed and intended to make her home. It was at the suggestion of

Wyman, and not of his mother, that she went to Horton's in September. She hated to go, and cried about it, and only went from the necessity of the case, and with the promise that she might return.

II. The conduct of Wyman Kimball was fraudulent in attempting to obtain aid for her in Grafton county before her return to his house; and it was with the design and for the purpose of making her a charge upon that county instead of Sullivan, that he was so ready to apply for aid for her from the selectmen of Enfield, upon the first request made to him to take her to his place, where she really belonged, and where all the relatives understood that she belonged. He goes at once, without consulting his mother, or even seeing her, and against the remonstrance of James and his wife, who offered to keep her until his son should recover, or die, when all understood she was to return to Wyman's.

He not only goes to the house of the selectman to make application, but when he finds Mr. How away, he writes a letter giving him the notice and requesting aid for his mother. Why did he not make a similar request of the selectmen of Sunapee before he carried her away from his house? He knew that those relatives at Enfield, as well as those at Hanover, were poor and not able to take care of her, and he would have applied at once to the selectmen of Sunapee to take her had it not been that he was acting under instructions, and was determined upon some pretext to get her into Grafton county before anybody was called on to assist him, and then she might return, and she could remain without any objection, as she has remained since until recently; and it was all right, provided only the application for aid could be first made in Grafton county, so as to cast the burden of her support upon that county, as he supposed and intended.

We claim that Wyman Kimball was acting under instructions from the commissioners of Sullivan county, or their agents, in this whole matter; and although the court seems to have found against us on that point, yet we think that it must be apparent from such other facts as are found in the case, that the design existed on the part of Wyman Kimball, from the first, to so arrange the matter as to get his mother into Grafton county, and while there to have an application made for aid, so that when she returned to his house as he had arranged that she should, and as he was no doubt expecting that she would, he could keep her at the expense of Grafton county instead of Sullivan county.

This is what Mr. Pattee honestly believed, and we think he had sufficient reason to believe it; and if he did he was in no fault in returning her to the man who had thus wrongfully undertaken to make her a charge upon Grafton county.

If this design existed on the part of Wyman Kimball, it was enough to warrant her return, even though he did it on his own motion without advice from anybody. And if Pattee believed such to be the fact, and his belief was founded upon probable cause, then he was justified in returning her at once to the man who thus wrongfully and fraudu-

lently was attempting to make her a charge upon Grafton county in order to shield and save harmless his own county from such liability.

III. But however these positions may be held, we claim that the conduct of Pattee was not such as to warrant the order for the return of the pauper made by the court in this case. We have two cases in this state which settle the law upon this subject—*Goshen* v. *Hillsborough County*, 45 N. H. 139, and *Merrimack County* v. *Sullivan County*, 45 N. H. 181. In the first of these it was held, that to give the court jurisdiction to order the removal of a pauper from one county to another, it must be made to appear that such pauper was first wilfully and fraudulently brought into the county where he did not belong, and through the wrongful agency of the county actually chargeable for his support.

In the opinion, it is said,—" A person may innocently transport a poor person from one county to another;" but in such case there would be no wrong done, and the court would not order a removal. " There must be some culpable intent shown, giving such act the character of crime, in order to expose the party committing it to the penalties prescribed in the tenth section of the act." Comp. Laws, ch. 71, secs. 10 and 11. And it is distinctly held, in both the cases cited, that no order for the removal of a pauper will be made or was intended to be made, except in a case where the tenth section of said chapter had been violated.

The same provisions are contained in Gen. Stats., ch. 75, secs. 9 and 10. There is no change in the law, so that to authorize the order asked for in this case it must appear that Pattee has been guilty of a violation of sec. 9 of ch. 75, Gen. Stats.; and, in order to be guilty of a violation of the provisions of that section, there must be shown to have been, on the part of Pattee, " some culpable intent " which should give to the act " the character of crime," or else he is not guilty of a violation of that section of the statute; and, of course, no order can properly be made for the return of the pauper.

This doctrine is also in accordance with the decisions in Massachusetts on this subject. *Greenfield* v. *Cushman*, 16 Mass. 393; *Deerfield* v. *Delano*, 1 Pick. 469. In both of these cases, the jury were instructed that they must find the intentions of the defendants to be wrong and fraudulent before they would be liable for the act of removal, and before the court would order the pauper returned.

We say that the facts were, that Pattee honestly believed what he said to Clark, that Sullivan county or Wyman Kimball was liable for her support, and what he told Mr. James Kimball, that a man had brought her out of Sullivan county under such circumstances that he did not think it would be right to assist her; and though the court has found that the pauper had no relatives in this state of sufficient ability to support her, yet it is not found that Pattee had knowledge of that fact. Now Pattee believed that Wyman Kimball was able to support his mother, and was liable to do so. There is nothing in the finding of the court that negatives such belief.

Pattee also knew the fact that Wyman Kimball had given his consent that his mother might return to his house when his son should either die or recover; and he knew, also, the fact, that before James Kimball applied for any aid for his mother, this son of Wyman was dead; and he also knew that the mother was anxious to return to Wyman's.

Now, believing Wyman was able and liable to support his mother, and knowing that he had agreed that she might return to his house when his son should die, and knowing that this son was dead, and knowing that the mother desired to return, where was the fraudulent, the "culpable intent," which gave to the act of returning her "the character of crime," as it must do in order to be a violation of the statute, or to warrant an order by the court for her return? And this criminal intent must be proved. It is not to be inferred, and not to be presumed. It must be proved affirmatively. *Goshen* v. *Hillsborough County, supra.* Hence, while the finding of the court does not negative such belief and such knowledge on the part of Pattee, it cannot be assumed, or presumed, or inferred that he did not so believe and know.

Until the contrary is proved and found, we have a right to assume that what he said as to his belief was true, and that he knew all the above facts in the case, and if so, then, with such belief and such knowledge, he was clearly justified in sending her to Wyman where she desired to go, and where she had Wyman's consent that she might go. At least, there would not be any "culpable intent" shown, which would give to the act "the character of crime." There is nothing in the findings of the court in this case that negatives any of these positions as to Pattee's belief and knowledge.

If there was any criminal intent on his part, it is not proved nor found, and it cannot be presumed; while, if we assume that what the case finds that he said about his belief is true, and if we may assume that he knew such facts as the case finds to be true,—there being nothing in the finding of the court or the evidence tending to show that he did not so believe and know,—then there was nothing criminal or wrong in the act which Pattee did in sending back the pauper. We claim, then, that the evidence did not support the petition, nor do the findings of the court support it, but fail entirely to do so. We therefore pray that the petition be dismissed.

*Foster, C. J., C. C. This is a very plain case, and its distinct features are neither obscured nor brought into bolder relief by the minute recital of all its circumstances and conditions. The material facts, about which there is no dispute, are these : One of the commissioners of Grafton county hired James Kimball, for the sum of ten dollars, to take and remove from Grafton county into Sullivan county a poor and indigent woman, who had no visible means of support, no legal settlement in any town, nor any relation in Sullivan county chargeable for

---

* Cushing, C. J., and Smith, J., did not sit.

her support, the commissioner being very fully informed of all the circumstances of the case.

Every condition of the statute upon which the petitioners claim relief is fulfilled in the case.

The law is,—" If any person shall bring and leave, or bring with intent to leave, any poor and indigent person, having no visible means of support, into any county, from any other county in which such poor person has resided or been supported, such person not having a legal settlement in any town, nor any relation chargeable for his support within the county into which such poor person is brought, knowing him to be thus poor and indigent, he shall be fined not exceeding two hundred dollars nor less than thirty dollars, or be imprisoned not exceeding six months.

" Every such poor and indigent person may be removed from said county, by order of the supreme court, into the county from which he was so brought as aforesaid."    Gen. Stats., ch. 75, secs. 9, 10.

It is insisted by counsel for the defendants that the court has no jurisdiction to order the removal of the pauper, unless it be made to appear that Pattee, the Grafton commissioner, in procuring her extradition from Grafton county, was influenced by a " culpable intent," investing the act with " the character of a crime."

In support of this position, the learned counsel for the defence refer us to four cases—two in this state and two in Massachusetts—which seem, to my mind, to enunciate sound and wholesome doctrine, but which fall very far short of sustaining the proposition for the support of which they are evoked.

The law often finds a culpable intent, in a somewhat technical sense, where there is, in fact, no moral depravity.   In a legal sense, that act or intention is culpable which is unlawful, within the knowledge of the party perpetrating or intending the act.

Every person is presumed to know the law; and this presumption should most certainly be applied to those county officials who are charged by the law with specified obligations concerning matters of this nature,—the care and relief of the poor.

The law does not authorize the commissioners to determine in any such summary manner the question of the liability of their county for a pauper's support.   On the contrary, it makes such a practical relief of the burden as Mr. Pattee devised and effected in this case, an unlawful act, and one for which substantial punishment is prescribed.

The case finds full knowledge on the part of Mr. Pattee; and the authorities cited by the defendants' counsel are clearly to the effect that the *knowledge* spoken of in the statute " must necessarily imply culpable intent."    SARGENT, J., in *Merrimack* v. *Sullivan*, 45 N. H. 182, in approval of this doctrine as announced by the Massachusetts courts in the cases there cited.

Whatever may have been his impression as to the legal liability of the one county or the other, Mr. Pattee was bound to know that it was unlawful to undertake to determine it in the manner adopted by him.

Knowing the law, he violated it; and this knowledge concerning the character of his act implies the culpable intent which brings it within the statute. In other words, proof of the commission of the prohibited act conclusively establishes the intent to violate the law. The natural consequences of his act were a violation of the law; therefore he intended to violate the law. 1 Bishop Cr. Law, sec. 665; 2 *ib.*, sec. 42.

I do not say that these elementary principles would in all circumstances be practically applied, to the detriment of the party prosecuted for the misdemeanor which the statute has created and defined. The *actual* animus of the accused would be considered in such a case; but his ignorance, or misjudgment, or false interpretation of the conditions of the case, as affected by the law, cannot avail to subvert the well settled principles upon which this case rests.

The result is, the pauper having been brought into the county of Sullivan through the violation of the provisions of section 9, chap. 75, Gen. Stats., must be returned and removed to the county whence she came, by force of the provisions of the tenth section of the same chapter.

Ladd, J. I am of the same opinion. Mrs. Phillips was a poor and indigent person, having no visible means of support. She was in the county of Grafton, and had no legal settlement in any town, nor any relation chargeable with her support in the county of Sullivan. Mr. Pattee, knowing her to be thus poor and indigent, procured her removal from the county of Grafton to the county of Sullivan. What more is necessary to bring the case within the strictest letter of the statute? It is argued, on behalf of Grafton county, that there must be some culpable intent shown, on the part of Mr. Pattee, before the order of removal can be made. Granting that to be so, what is wanting to constitute the offence described in section 9 of the statute? He had all the knowledge required, that is, knowledge that Mrs. Phillips was poor, &c., and with that knowledge did all the act necessary to constitute the offence, that is, brought and left her in Sullivan county. The defendants' argument seems to assume that something more was necessary—that some moral turpitude must be shown. Doubtless there must be an intent to do what is forbidden by law; but, in a case like this, there can be no question but the act conclusively establishes the intent;—see a useful discussion of this point in the recent case of *Queen* v. *Hicklin*, Law Rep., 3 Q. B. 360.

Upon the facts stated, I think there can be no doubt but that the offence prohibited by section 9 has been committed, inasmuch as Mr. Pattee must be taken to have intended the natural consequences of his act, which was a violation of law, and that an order of removal should be made according to the prayer of the petition.

Stanley, J., C. C. I am of the same opinion. Mrs. Phillips was poor, and unable to support herself. She had no relations of sufficient ability to support her. She had no legal settlement in this state. She was a resident of the county of Grafton, and that county had been

applied to to assist her. Mr. Pattee, one of the commissioners for that county, knew all the material facts about her; and knowing them, he employed James Kimball to carry her and leave her in the county of Sullivan. It is argued, on behalf of the defendants, that no culpable intent is shown on the part of Mr. Pattee; but the acts being shown, the intent is an inference from them. That he intended to throw the burden of her support upon Sullivan county, there can be no manner of doubt. His acts are consistent with no other theory. Such an act is precisely what the statute was intended to prohibit.

*The prayer of the petition should therefore be granted, and the order for removal made.*